UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JEANNETTE DRAKE, | CASE NO. 1:24-CV-00247-BYP |
| Plaintiff, | JUDGE BENITA Y. PEARSON |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION |
| Defendant. | |

INTRODUCTION

Plaintiff Jeannette Drake challenges the Commissioner of Social Security's decision denying survivor's benefits. (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On February 9, 2024, under Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Feb. 9, 2024). Briefing from the parties was completed as of August 30, 2024. (*See* ECF #16). Following review, and for the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision.

PROCEDURAL BACKGROUND

Ms. Drake applied for survivor's benefits on August 3, 2017, after the death of her alleged common-law husband James Woodson, an insured worker. (Tr. 135). The claim was denied initially on September 30, 2017. (Tr. 63). On October 17, 2017, Ms. Drake requested

1

reconsideration (Tr. 68) and on November 3, 2019, the Commissioner awarded survivor's benefits beginning June 2017. (Tr. 69).

On July 16, 2020, the Commissioner reversed the decision and revoked benefits. (Tr. 73-74). On July 23, 2020, Ms. Drake requested a hearing before an administrative law judge. (Tr. 131-32). On October 4, 2022, Ms. Drake (represented by counsel) testified before the ALJ. (Tr. 23-61). After the hearing, the ALJ asked Ms. Drake to submit additional documentation of her claimed common-law marriage. (Tr. 188).

On January 12, 2023, the ALJ determined Ms. Drake was not the wife of Mr. Woodson and thus not eligible for survivor's benefits. (Tr. 15-18). On December 4, 2023, the Appeals Council denied Ms. Drake's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. § 404.984(b)(2)). Ms. Drake then timely filed this action on February 8, 2024. (ECF #1).

## FACTUAL BACKGROUND

### I. Relevant Testimonial Evidence

Ms. Drake and Mr. Woodson met while Ms. Drake was in the sixth grade. (Tr. 35). They began a relationship, fell in love, and moved in together in 1972. (*Id.*). Ms. Drake testified that at that point, she and Mr. Woodson intended to be married. (Tr. 36-37). Although she acknowledges there are no marriage records, she recounted they were comfortable and felt they did not need a "paper saying that we [were] married." (Tr. 37).

Ms. Drake and Ms. Woodson lived together until Mr. Woodson passed in 2017. (*See* Tr. 37, 42-43). They were together every day. (Tr. 39). Ms. Drake described living a "simple life" of working, raising their two daughters, and watching the Cleveland Browns. (*See* Tr. 38-39). When

Mr. Woodson fell ill with terminal interstitial lung disease, Ms. Drake accompanied him to every medical appointment and cared for him until he passed. (Tr. 41; *see also* Tr. 187).

Mr. Woodson was the biological father of one of Ms. Drake's daughters, while another was the product of an affair for which Mr. Woodson forgave Ms. Drake. (Tr. 53-55). Ms. Drake had a close relationship with Mr. Woodson's extended family, and they considered her as his wife. (Tr. 39-40).

The couple purchased two houses, one as a residence in the 1990s and one as a rental property in 2007. (Tr. 44-45). For both houses, Mr. Woodson was omitted from the deed and the mortgage because of his poor credit score. (Tr. 44-46). When the two rented, Mr. Woodson would again be left off the application to avoid a credit check and Ms. Drake would apply alone. (Tr. 52).

Although Ms. Drake was obligated to pay the mortgage note, Mr. Woodson helped pay for the mortgage on the house where they lived. (Tr. 48). For their rental property, Mr. Woodson collected rent payments and gave them to Ms. Drake to deposit into the bank account where the mortgage payments were withdrawn. (Tr. 46, 48). The two would split any leftover money on bills and food. (Tr. 47). Utilities were under Ms. Drake's name only, but Mr. Woodson paid for them. (Tr. 48, 53).

The two generally kept separate finances. (Tr. 49). They opened a joint savings account in 1972 but closed it in 1975. (Tr. 50; *see also* Tr. 143). Since then, they did not open a joint account. (Tr. 49-50, 53). They filed taxes separately. (Tr. 53). Ms. Drake received child support from Mr. Woodson for his biological daughter while the two were together. (Tr. 54, 56). They pooled money for vacations. (Tr. 53).

When Mr. Woodson died, he left his estate to his biological daughter, his brother, and his cousin. (Tr. 57). Ms. Drake explained their biological daughter had recently purchased a home and they wanted to ensure she was taken care of. (*See id.*).

## II.     Relevant Documentary Evidence

In connection with her application for benefits, Ms. Drake submitted a statement of martial relationship signed under penalty of perjury. (Tr. 156-59). In it, she declared she and Mr. Woodson began living continuously together since April 1972, planned to live together forever, and called each other husband and wife. (Tr. 156-57). She checked that she believed living together made her legally married and that there was no promise to hold a marriage ceremony in the future. (Tr. 157). Ms. Drake recounted that she went by Jeannette Drake-Woodson while the two lived together. (*Id.*).

Angela Drake, Mr. Woodson's biological daughter, submitted a third-party statement under penalty of perjury concerning her parents' relationship. (Tr. 161-62). She considered her parents to be married and recounted they referred to each other as spouses everywhere. (Tr. 161).

Alisha Drake, Mr. Woodson's stepdaughter, also submitted a third-party statement under penalty of perjury about her parents' relationship. (Tr. 163-64). She also considered her mother and stepfather to be married and recounted they referred to each other as spouse all the time at home. (Tr. 163). Alisha Drake also submitted a letter describing her family life. (Tr. 198). She writes "Mom was always his wife and me his daughter." (*Id.*). When Mr. Woodson fell ill at the end of his life, Ms. Drake received help from Angela Drake, Mr. Woodson's biological daughter, and Angela managed Mr. Woodson's affairs. (*Id.*).

Bettie Hodges, Mr. Woodson's cousin, also submitted a third-party statement under penalty of perjury about Mr. Woodson and Ms. Drake's relationship. (Tr. 165-66). She considered

4

the two to be married as they had been together since the 1970's, had a child together, and treated each other as husband and wife. (Tr. 165). Ms. Hodges reported hearing them refer to each other as spouse all the time. (*Id.*).

Other family members of Mr. Woodson submitted notarized letters in support of Ms. Drake's and Mr. Woodson's common-law marriage, including three from Mr. Woodson's first cousins (Tr. 180, 181, 183) and one from the couple's landlord from 1978-1982 (Tr. 184). In a separate letter, Mr. Woodson's physician identified Ms. Drake as Mr. Woodson's "primary caregiver." (Tr. 187).

In 1982, Mr. Woodson executed a will. (Tr. 193-96). He devised his estate 90% to his biological daughter, 5% to his brother, and 5% to his sister. (Tr. 193). His will does not mention Ms. Drake at all.

Mr. Woodson executed an Ohio Living Will Declaration on February 1, 2018. (Tr. 153-55). There, he named Jeannette Drake as his first contact. Although the writing is difficult to decipher, it appears to describe Ms. Drake as his "significant other," not as his "wife." (Tr. 155). The Declaration in the record is also incomplete, having only four of the seven pages. (*See* Tr. 153-55).

Mr. Woodson's death certificate lists his surviving spouse as "Jeannette Unknown." (Tr. 197). Notably, the box is labelled: "17. Surviving Spouse's Name (if wife, give name prior to first marriage)." (*Id.*).

### STANDARD FOR BENEFITS

The widow of an insured decedent is entitled to social security benefits. *See* 42 U.S.C. § 402(e). A claimant is entitled to benefits as the widow of a person who died fully insured if:

5

1. The claimant is the insured's widow based on a valid marriage;

2. The claimant is at least 60 years old or is at least 50 years old and has a disability;

3. The claimant is not entitled to an equal or larger old-age benefit; and,

4. The claimant is unmarried, subject to exceptions not applicable here.

*See* 20 C.F.R. §§ 404.335, 404.345, 404.356(a). Because Ms. Drake is 60 years old or older, eligibility for benefits does not turn on the existence of "disability." *See id.* § 404.335(c). Consequently, the familiar five-step sequential analysis does not apply to Ms. Drake's case.

## THE ALJ'S DECISION

The ALJ found Ms. Drake and Mr. Woodson were legally competent to marry. (Tr. 15). But the ALJ also concluded Ms. Drake and Mr. Woodson (1) did not have a present intent to be married, (2) did not agree between themselves that they were truly and legally married, and (3) were not treated and reputed as husband and wife within their community. (Tr. 16). As a result, the ALJ ultimately concluded Ms. Drake had not established a common-law marriage with Mr. Woodson and so was not entitled to survivor's benefits. (Tr. 18).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant

6

evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

7

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.")

## DISCUSSION

Ms. Drake argues the ALJ:

1. Failed to properly assess Ms. Drake's marriage under Ohio law, and

2. Accorded improper weight to evidence proving Ms. Drake's common-law marriage.

(*See* ECF #15 at PageID 342). The Commissioner responds that the ALJ reasonably concluded Mr. Drake had not established a valid common law marriage under Ohio law by clear and convincing evidence, and so was not entitled to widow's insurance benefits. (ECF #16 at PageID 353). The parties agree Ms. Drake is (1) more than 60 years old, (2) not entitled to an equal or larger old-age benefit, and (3) currently unmarried. Thus, Ms. Drake's eligibility for benefits turns exclusively on whether she and Mr. Woodson were in a legally recognized common-law marriage.

Ms. Drake first argues the ALJ did not properly assess her marriage under Ohio law. (ECF #15 at PageID 344). When deciding a claimant's relationship as an insured worker's spouse, the Social Security Administration considers the laws of the state where the insured had a permanent home. 20 C.F.R. § 404.345. Thus, because Mr. Woodson's permanent home was in Ohio, Ms. Drake's claimed common-law marriage to Mr. Woodson must satisfy Ohio law or she is not eligible for widow's benefits.

8

Ohio formerly recognized[1] a common-law marriage when a couple: (1) had "a mutual agreement of marriage *in praesanti*," meaning, the present intent to marry; (2) cohabited as husband and wife; (3) held themselves out to the public as husband and wife; and (4) had a reputation in the community as husband and wife. *See United States v. Shepas*, No. 4:04-CV-2162, 2005 WL 8244052, at *3 (N.D. Ohio July 7, 2005) (quoting *In re Hammonds' Est.*, 315 N.E.2d 843 (Ohio Ct. Com. Pl. 1973)). An agreement to marry *in praesenti* may be proven by (1) direct evidence of an agreement or (2) proof of cohabitation, acts, declarations, the conduct of the couple, and their recognized status in the community in which they live. *Winthrop v. Harden*, No. 79803, 2002 WL 31528720, at *3 (Ohio Ct. App. Nov. 14, 2002).

Ms. Drake does not contend the ALJ applied the wrong legal standard, mis-analyzed Ohio law, or failed to follow the applicable regulations. Rather, her argument simply recapitulates the evidence she presented in favor of the common-law marriage. (*See id.* at PageID 344-47). The issue before this court is whether substantial evidence supported the ALJ's determination that Ms. Drake and Mr. Woodson did not have a common-law marriage under Ohio law, not whether the evidence when viewed *de novo* establishes a common-law marriage. *See Smith-Wilkins on Behalf of Hertzer v. Sec'y of Health & Hum. Servs.*, 880 F.2d 864, 865-66 (6th Cir. 1989).

Here, the ALJ noted that Ms. Drake and Mr. Woodson cohabitated for 45 years, raised two children, and shared the cost of their residence. (Tr. 16) (citing Tr. 148, 171). The ALJ discussed several statements from friends, family members, and landlords that indicate Ms. Drake and Mr.

---

[1] Ohio ceased recognizing common-law marriages as of October 10, 1991. *See* Ohio Rev. Code § 3105.12(B)(1). But "[c]ommon law marriages that occurred in this state prior to October 10, 1991, and that have not been terminated by death, divorce, dissolution of marriage, or annulment remain valid on and after October 10, 1991." *Id.* § 3105.12(B)(2).

9

Woodson had acted as if they were married. (*Id.*) (citing Tr. 161-66, 180-87). The ALJ credited Ms. Drake's testimony that she spent holidays with Mr. Woodson's family, and she cared for him when he fell ill until his death. (Tr. 16-17).

An ALJ is obligated to examine whether the evidence presented agrees with other available evidence. 20 C.F.R. § 404.708(f). To that end, the ALJ also properly considered the documentary evidence that was inconsistent with Mr. Woodson and Ms. Drake being in a common-law marriage. Specifically, the ALJ noted that in a 2015 application for disability insurance benefits, Mr. Woodson stated under penalty of perjury he was never married. (Tr. 18) (citing Tr. 74). When Mr. Woodson executed his will in 1982, he did not mention Ms. Drake at all and left nothing to her or to his then-minor adoptive daughter, instead leaving his estate primarily to his then-minor biological daughter and to his brother and sister. (Tr. 17) (citing Tr. 193-96). The ALJ noted the 1982 will was inconsistent with statements by Ms. Drake and his daughter about the naming of his beneficiaries close to Mr. Woodson's death and that the intent was to ensure Mr. Woodson's biological daughter could pay off her recent mortgage. (Tr. 17). The ALJ further noted that Mr. Woodson's more recent Ohio Living Will Declaration referred to Ms. Drake as his "significant other" rather than his "wife" when naming her with healthcare power-of-attorney. (*Id.*) (citing Tr. 155).

The ALJ ultimately concluded there was not sufficient evidence to establish Ms. Drake and Mr. Woodson were in a common-law marriage. There is no direct evidence of an agreement between Ms. Drake and Mr. Woodson to be married and Ms. Drake testified the two did not feel a need for a formal agreement. (*See* Tr. 37). There is proof of long cohabitation and statements in favor of the marriage from members of their community that support a common-law marriage. *See*

*Winthrop*, 2002 WL 31528720, at *3. But the acts and statements of the couple undercut the existence of the marriage as Mr. Woodson's 2017 application for benefits indicated he was not married and his Living Will Declaration identified her as his "significant other." The ALJ is tasked with resolving such conflicts in the evidence. *Richardson v. Perales*, 402 U.S. 389, 399 (1971). The ALJ did so here, finding the evidence insufficient to establish a common-law marriage. Although Ms. Drake marshals substantial evidence in support of her common-law marriage, the ALJ's decision cannot be reversed just because the court might have reached a different conclusion in the first instance on the same evidence. *See Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."). Consequently, I do not recommend the district court order remand on this basis.

Second, Ms. Drake argues the ALJ overly focused on her inability to provide certain documentary evidence of a marriage that the ALJ requested. (ECF #15 at PageID 347-48). After the hearing, the ALJ requested additional evidence, including any wills, tax returns, insurance policies, pension documents, or child support documents. (Tr. 188). Ms. Drake provided Mr. Woodson's will and death certificate but could not provide the other documents. (*See* Tr. 193-97).

Ms. Drake cites Social Security Manual § 1717 which provides "Evidence to prove a common-law marriage in the States that recognize such marriages must include . . . If either the husband or wife is dead, a statement from the surviving widow or widower and statements from two blood relatives of the decedent." *See Soc. Sec. Handbook* § *1717.1*, Soc. Sec. Admin., http://www.ssa.gov/OP_Home/handbook/handbook.17/handbook-1717.html (last accessed Nov. 19, 2024) (emphasis omitted). Ms. Drake submitted the statements. (Tr. 156-59, 161-66).

11

Presuming without deciding the handbook would be binding on an ALJ in this situation such that failing to follow the Handbook would be reversible error, the ALJ did not disregard the Handbook's instructions. Ms. Drake's argument conflates a necessary condition with a sufficient one: the Handbook states a recognized common-law marriage must be supported by certain documents but does not state that a spouse with such documents *must* be recognized as in a common-law marriage.

This difference is borne out in the Commissioner's other guidance on common-law-marriage determinations. For instance, the Programs Operations Manual System ("POMS") lists the "[p]referred evidence when one spouse is deceased" as an "SSA-754-F4 from the surviving spouse, SSA-753 from a blood relative of the surviving spouse, and SSA-753s from two blood relatives of the deceased spouse." *See Program Operations Manual System, GN 00305.065 Development of Common-Law (Non-Ceremonial) Marriages*, Soc. Sec. Admin., http://secure.ssa.gov/apps10/poms.nsf/lnx/0200305065 (last accessed Nov. 19, 2024). But the POMS also instructs to "[o]btain corroborating evidence (e.g., mortgage or rent receipts, insurance policies, medical records, bank records) to substantiate the fact that the couple considered and held themselves out as a married couple." *Id.* The POMS notes that the list "is not all-inclusive, and there may be other acceptable evidence." *Id.* Were the trio of forms to be sufficient on their own to establish a common-law marriage, POMS would not suggest seeking further evidence.

If anything, the POMS instruction to develop corroborating documentary evidence suggests that the ALJ did not err in seeking the other corroborating evidence and then concluding from the absence of such evidence that Ms. Drake did not establish a common-law marriage with Mr. Woodson. Even presuming the Social Security Handbook to be binding on the ALJ, the ALJ

12

did not disregard the Handbook's instructions by seeking additional documentary evidence corroborating the marriage and then basing her conclusion in part on Ms. Drake's inability to produce that evidence. I thus recommend the district court decline to order remand on this basis.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying survivor's benefits.

Dated: November 19, 2024

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

13